**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LACHERYL ONEAL, LATONYA WILLIAMS, and FANNIE COLAY, <br><br> on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> LUMICO LIFE INSURANCE COMPANY, <br><br> Defendant. | Case No. _____ <br><br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiffs, Lacheryl Oneal, Latonya Williams, and Fannie Colay, ("Plaintiffs") individually and on behalf of all similarly situated persons, allege the following against Lumico Life Insurance Company ("Lumico" or "Defendant") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by their counsel and review of public documents, as to all other matters:

### I.    INTRODUCTION

1.    Plaintiffs bring this class action against Lumico for its failure to properly secure and safeguard Plaintiffs' and other similarly situated Lumico customers' sensitive information, including full names, contact information, genders, dates of birth, Social Security numbers, addresses, and policy numbers ("personally identifiable information" or "PII").

2.    Defendant is "a part of Swiss Re, a global financial services organization and Fortune 500 company" and provides "life and supplemental health insurance[,]" to more than

1

225,000 current and former customers.[1]

3.      Upon information and belief, former and current Defendant customers are required to entrust Defendant with sensitive, non-public PII, without which Defendant could not perform its regular business activities, in order to obtain insurance and/or other services from Defendant. Defendant retains this information for at least many years and even after the consumer relationship has ended.

4.      By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

5.      On or about June 19, 2023, Defendant learned that one its IT vendors had been penetrated by a cyberattack and that "an unauthorized third party exploited the vulnerability in the MOVEit application. . . and may have acquired some of our policyholder information."[2] In response, Defendant investigated the scope and nature of the Data Breach by "review[ing] . . . the data provided by NTT[.]"[3] As a result of its investigation, Defendant concluded—on or about June 30, 2023—that "the unauthorized third party in fact had acquired some of our policyholder information[.]"[4]

6.      According to Defendant's Notice of Security Incident letter (the "Notice Letter"), the compromised PII included individuals' full names, contact information, genders, dates of birth, Social Security numbers, addresses, and policy numbers.[5]

---

[1] https://lumico.com/about-us (last accessed Aug. 6, 2023).
[2]      The      "Notice      Letter".      A      sample      copy      is      available      at
https://attorneygeneral.delaware.gov/fraud/cpu/securitybreachnotification/database/ (last accessed Aug. 6, 2023).
[3] *Id.*
[4] *Id.*
[5] *Id.*

7.      Defendant failed to adequately protect Plaintiffs' and Class Members PII—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted PII was compromised due to Defendant's negligent and/or careless acts and omissions and their utter failure to protect customers' sensitive data. Hackers targeted and obtained Plaintiffs' and Class Members' PII because of its value in exploiting and stealing the identities of Plaintiffs and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

8.      Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the PII of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts at least to negligence and violates federal and state statutes.

9.      Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures and ensure those measures were followed by its IT vendors to ensure that the PII of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

10.      Plaintiffs and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) each Plaintiffs' PII being disseminated on the dark web; (ii) Plaintiff Williams experiencing three fraudulent charges to her financial account in or about June 2023 through August 2023; (iii) Plaintiff Colay experiencing identity theft in the form of a fraudulent bank account opened false under her name; (iv) an increase in spam calls, texts, and/or emails; (v) invasion of privacy; (vi) lost or diminished value of PII; (vii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (viii) loss of benefit of the bargain; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

11.      Plaintiffs and Class Members seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## II.   PARTIES

12.      Plaintiff, Lacheryl Oneal, is, and at all times mentioned herein was, an individual citizen of Riverdale, Illinois.

13.      Plaintiff, Latonya Williams, is, and at all times mentioned herein was, an individual citizen of Sauk Village, Illinois.

14.      Plaintiff, Fannie Colay, is, and at all times mentioned herein was, an individual citizen of Warner Robins, Georgia.

15.      Defendant is a Missouri corporation with a principal place of business located in

4

Armonk, New York.

## III.     JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is over 100, many of whom reside outside the state of New York and have different citizenship from Lumico, including each Plaintiff. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A)

17.     This Court has jurisdiction over Lumico because Lumico operates in this District.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is located in this District, a substantial part of the events giving rise to this action occurred in this District, and Lumico has harmed Class Members residing in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     *Defendant's Business*

19.     Defendant is "a part of Swiss Re, a global financial services organization and Fortune 500 company" and provides "life and supplemental health insurance[,]" to more than 225,000 current and former customers.[6]

20.     Plaintiffs and Class Members are current and former Lumico customers.

21.     As a condition of receiving its products and/or services, Lumico requires that its customers, including Plaintiffs and Class Members, entrust it with highly sensitive personal information.

22.     The information held by Defendant in its computer systems or those of its vendors

---

[6] https://lumico.com/about-us (last accessed Aug. 6, 2023).

at the time of the Data Breach included the unencrypted PII of Plaintiffs and Class Members.

23.     Upon information and belief, Defendant made promises and representations to its customers, including Plaintiffs and Class Members, that the PII collected from them as a condition of obtaining products and/or services at Defendant would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

24.     Indeed, Defendant's Privacy Policy provides that:

- We restrict access to NPI to our employees who need it for their jobs.

- We use your NPI only as is necessary for us to provide insurance products and services.

- We require non-affiliates that perform services for us to protect your NPI and not use it for any other purpose.

- We verify that anyone asking for your NPI is entitled to it before we give it.

- We collect your health information only with your written authorization.

- We disclose your NPI only as permitted or required by law.

- We do not disclose your NPI to others for their own marketing purposes.

- We do not reveal your health, character, personal habits or reputation to anyone for marketing purposes.

- We maintain physical, electronic, and procedural safeguards to protect your NPI.[7]

25.     Plaintiffs and Class Members provided their PII to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

26.     Plaintiffs and the Class Members have taken reasonable steps to maintain the

---

[7] https://lumico.com/privacypolicy  (last accessed Aug. 6, 2023).

confidentiality of their PII. Plaintiffs and Class Members relied on the sophistication of Defendant to keep their PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members value the confidentiality of their PII and demand security to safeguard their PII.

27.     Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiffs and Class Members from involuntary disclosure to third parties and to audit, monitor, and verify the integrity of its IT vendors and affiliates. Defendant has a legal duty to keep consumer's PII safe and confidential.

28.     Defendant had obligations created by FTC Act, Gramm-Leach-Bliley Act, contract, industry standards, and representations made to Plaintiffs and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

29.     Defendant derived a substantial economic benefit from collecting Plaintiffs' and Class Members' PII. Without the required submission of PII, Defendant could not perform the services it provides.

30.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

**B.**     ***The Data Breach***

31.     On or about July 24, 2023, Defendant began sending Plaintiffs and other Data Breach victims a Notice of Security Incident letter (the "Notice Letter"), informing them that:

> **What Happened?** Progress Software disclosed that cyber criminals actively exploited a vulnerability in the MOVEit Transfer application. Because thousands of organizations use MOVEit to support secure file transfers, this incident has affected many companies around the world, including our third-party service provider NTT Data Services ("NTT"), and has been the subject of widespread media coverage.

On June 19, 2023, NTT informed us that, between May 29 and 30 of this year, an unauthorized third party exploited the vulnerability in the MOVEit application, which NTT's external vendor Pension Benefits Information, LLC ("PBI") uses, and may have acquired some of our policyholder information. For context, we provide NTT with policyholder data that it shares with PBI to perform regulatory compliance and operational support services for the benefit of our policies.

As explained to us by NTT, PBI completed the recommended patching and remediation steps to secure its systems on June 2 and has informed law enforcement of the incident. On June 30, our review of the data provided by NTT determined that the unauthorized third party in fact had acquired some of our policyholder information, as listed below. The incident occurred entirely within PBI's systems, and we have no reason to believe that it impacted our own systems or network environment. As noted, we are also one of many companies affected by the incident, and we have no reason to believe that our policyholder data was specifically targeted.

**What Information Was Involved?** Based on our analysis, we believe the following types of information related to you were impacted:
- Contact information, including name;
- Gender;
- Social Security number;
- Date of birth;
- Address; and
- Policy numbers.[8]

32.     Omitted from the Notice Letter were the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their PII remains protected.

33.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

---

[8] Notice Letter.

34.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed. Moreover, Defendant failed to exercise due diligence in selecting its IT vendors or deciding with whom it would share sensitive PII.

35.     The attacker accessed and acquired files Defendant shared with a third party containing unencrypted PII of Plaintiffs and Class Members, including their Social Security numbers and other sensitive information. Plaintiffs' and Class Members' PII was accessed and stolen in the Data Breach.

36.     Plaintiffs Oneal, Williams, and Colay have each been notified that their PII has been disseminated on the dark web (as discussed below), and Plaintiffs further believe the PII of Class Members was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

**C.     *Defendant Acquires, Collects, And Stores Plaintiffs' and the Class's PII***

37.     As a condition to obtain products and/or services from Lumico, Plaintiffs and Class Members were required to give their sensitive and confidential PII to Defendant.

38.     Defendant retains and stores this information and derives a substantial economic benefit from the PII that they collect. But for the collection of Plaintiffs' and Class Members' PII, Defendant would be unable to perform its services.

39.     By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting the PII from disclosure.

40.     Plaintiffs and Class Members have taken reasonable steps to maintain the

confidentiality of their PII and relied on Defendant to keep their PII confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

41.    Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the PII of Plaintiffs and Class Members or by exercising due diligence in selecting its IT vendors and properly auditing those vendor's security practices.

42.    Upon information and belief, Defendant made promises to Plaintiffs and Class Members to maintain and protect their PII, demonstrating an understanding of the importance of securing PII.

43.    Indeed, Defendant's Privacy Policy provides that:

- We restrict access to NPI to our employees who need it for their jobs.

- We use your NPI only as is necessary for us to provide insurance products and services.

- We require non-affiliates that perform services for us to protect your NPI and not use it for any other purpose.

- We verify that anyone asking for your NPI is entitled to it before we give it.

- We collect your health information only with your written authorization.

- We disclose your NPI only as permitted or required by law.

- We do not disclose your NPI to others for their own marketing purposes.

- We do not reveal your health, character, personal habits or reputation to anyone for marketing purposes.

- We maintain physical, electronic, and procedural safeguards to protect your NPI.[9]

---

[9] https://lumico.com/privacypolicy  (last accessed Aug. 6, 2023).

44.     Defendant's negligence in safeguarding the PII of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**E.      *Defendant Knew or Should Have Known of the Risk Because Insurance Companies In Possession Of PII Are Particularly Suspectable To Cyber Attacks***

45.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting insurance companies that collect and store PII, like Defendant, preceding the date of the breach.

46.     Data thieves regularly target companies like Defendant's due to the highly sensitive information that they custody. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

47.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[10]

48.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

49.     Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report

---

[10] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6.

explained, smaller entities that store PII are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[11]

50. As a custodian of PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiffs and Class members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiffs and Class Members as a result of a breach.

51. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

52. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

53. Additionally, as companies became more dependent on computer systems to run their business,[12] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[13]

54. Defendant was, or should have been, fully aware of the unique type and the

---

[11]https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection (last accessed Oct. 17, 2022).
[12]https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html
[13]    https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

significant volume of data on Defendant's server(s), amounting to potentially thousands of individuals' detailed, PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

55.    In the Notice Letter, Defendant offers to cover 24 months of identity monitoring for Plaintiffs and Class Members. This is wholly inadequate to compensate Plaintiffs and Class Members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiffs and Class Members' PII. Moreover, once this service expires, Plaintiffs and Class Members will be forced to pay out of pocket for necessary identity monitoring services.

56.    Defendant's offer of credit and identity monitoring establishes that Plaintiffs' and Class Members' sensitive PII *was* in fact affected, accessed, compromised, and exfiltrated from Defendant's computer systems.

57.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

58.    The ramifications of Defendant's failure to keep secure the PII of Plaintiffs and Class Members are long lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

59.    As an insurance company in possession of its customers' and former customers' PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to them by Plaintiffs and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class

Members as a result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

###### F.    *Value Of Personally Identifiable Information*

60.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[14] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[15]

61.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[16]

62.    For example, PII can be sold at a price ranging from $40 to $200.[17] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[18]

63.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information

---

[14] 17 C.F.R. § 248.201 (2013).

[15] *Id.*

[16] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 17, 2022).

[17] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 17, 2022).

[18] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Oct. 217, 2022).

compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names and Social Security numbers.

64.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[19]

65.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

66.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[20]

### G.     Lumico Failed to Comply with FTC Guidelines

67.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in

---

[19] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Oct. 17, 2022).
[20] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Oct. 17, 2022).

violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g.,*
*FTC v. Wyndham Worldwide Corp.,* 799 F.3d 236 (3d Cir. 2015).

68.    In October 2016, the FTC updated its publication, Protecting Personal
Information: A Guide for Business, which established cybersecurity guidelines for businesses. The
guidelines note that businesses should protect the personal customer information that they keep,
properly dispose of personal information that is no longer needed, encrypt information stored on
computer networks, understand their network's vulnerabilities, and implement policies to correct
any security problems. The guidelines also recommend that businesses use an intrusion detection
system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating
someone is attempting to hack into the system, watch for large amounts of data being transmitted
from the system, and have a response plan ready in the event of a breach.

69.    The FTC further recommends that companies not maintain PII longer than is
needed for authorization of a transaction, limit access to sensitive data, require complex passwords
to be used on networks, use industry-tested methods for security, monitor the network for
suspicious activity, and verify that third-party service providers have implemented reasonable
security measures.

70.    The FTC has brought enforcement actions against businesses for failing to
adequately and reasonably protect customer data by treating the failure to employ reasonable and
appropriate measures to protect against unauthorized access to confidential consumer data as an
unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify
the measures businesses must take to meet their data security obligations.

71.    These FTC enforcement actions include actions against insurance companies, like
Defendant.

72.     As evidenced by the Data Breach, Lumico failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its vendor's data security practices. Lumico's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

73.     Lumico was at all times fully aware of its obligation to protect the PII of its customers yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**H.    *Lumico Failed to Comply with the Gramm-Leach-Bliley Act***

74.     Lumico is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

75.     The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

76.     Defendant collects nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period Defendant were subject to the requirements of the GLBA, 15 U.S.C. §§ 6801.1, *et seq.*, and is subject to numerous rules and regulations promulgated on the GLBA statutes.

77.     The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial

Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

78.     Accordingly, Defendant's conduct is governed by the Privacy Rule prior to December 30, 2011 and by Regulation P after that date.

79.     Both the Privacy Rule and Regulation P require financial institutions to provide customers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Defendant violated the Privacy Rule and Regulation P.

80.     Upon information and belief, Defendant failed to provide annual privacy notices to customers after the customer relationship ended, despite retaining these customers' PII and storing that PII on Defendant's network systems.

81.     Defendant failed to adequately inform their customers that they were storing and/or sharing, or would store and/or share, the customers' PII on an insecure platform, accessible

to unauthorized parties from the internet, and would do so after the customer relationship ended.

82.     The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4.

83.     As alleged herein, Defendant violated the Safeguard Rule.

84.     Defendant failed to assess reasonably foreseeable risks to the security, confidentiality, and integrity of customer information and failed to monitor the systems of its IT partners or verify the integrity of those systems.

85.     Defendant violated the GLBA and its own policies and procedures by sharing the PII of Plaintiffs and Class Members with a non-affiliated third party without providing Plaintiffs and Class Members (a) an opt-out notice and (b) a reasonable opportunity to opt out of such disclosure.

19

I.      *Lumico Failed to Comply with Industry Standards*

86.     As noted above, experts studying cybersecurity routinely identify insurance companies as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

87.     Some industry best practices that should be implemented by insurance companies dealing with sensitive PII, like Lumico, include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

88.     Other best cybersecurity practices that are standard in the insurance industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

89.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

90.     Defendant failed to comply with these accepted standards in the insurance

industry, thereby permitting the Data Breach to occur.

J.     *Lumico Breached its Duty to Safeguard Plaintiffs' and Class Members' PII*

91.    In addition to its obligations under federal and state laws, Lumico owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Lumico owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII of Class Members

92.    Lumico breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data and failed to audit, monitor, or ensure the integrity of its vendor's data security practices. Lumico's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

      a.    Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

      b.    Failing to adequately protect customers' PII;

      c.    Failing to properly monitor its own data security systems for existing intrusions;

      d.    Failing to audit, monitor, or ensure the integrity of its vendor's data security practices;

      e.    Failing to sufficiently train its employees and vendors regarding the proper handling of its customers PII;

      f.    Failing to fully comply with FTC guidelines for cybersecurity in violation of the

FTCA;

g.    Failing to adhere to the Gramm-Leach-Bliley Act and industry standards for cybersecurity as discussed above; and,

h.    Otherwise breaching its duties and obligations to protect Plaintiffs' and Class Members' PII.

93.    Lumico negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' PII by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted PII.

94.    Had Lumico remedied the deficiencies in its information storage and security systems or those of its vendors and affiliates, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential PII.

**K.    *Common Injuries & Damages***

95.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their PII; I invasion of privacy; and (f) the continued risk to their PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs'

and Class Members' PII.

  **L.**  ***The Data Breach Increases Victims' Risk Of Identity Theft***

  96.  Plaintiffs and Class Members are at a heightened risk of identity theft for years to come.

  97.  As Plaintiffs Oneal, Williams, and Colay have each already experienced, the unencrypted PII of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the PII of Plaintiffs and Class Members.

  98.  The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

  99.  Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

  100.  For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can

be the starting point for these additional targeted attacks on the victim.

101.    One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[21]

102.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

103.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

104.    The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like driver's license numbers) of Plaintiffs and the other Class Members.

---

[21] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/ (last visited on May 26, 2023).

105.    Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

106.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

**M.    *Loss Of Time To Mitigate Risk Of Identity Theft And Fraud***

107.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

108.    Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must, as Defendant's Notice Letter instructs,[22] "remain vigilant" and monitor their financial accounts for many years to mitigate the risk of identity theft.

109.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter, replacing debit cards, contacting financial institutions to sort out fraudulent activity and/or secure their financial accounts, contacting credit bureaus to secure their accounts, changing passwords and resecuring their own computer networks, and contacting merchants about potentially fraudulent charges.

110.    These efforts are consistent with the U.S. Government Accountability Office that

---

[22] Notice Letter.

released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[23]

111.    These efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[24]

112.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[25]

---

[23] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[24] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited July 7, 2022).
[25] Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at:
https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php  (last visited Sep 13, 2022).



113.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[26]

### N.    *Diminution Value Of PII*

114.    PII is a valuable property right.[27] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has

---

[26] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Sep. 13, 2022) ("GAO Report").

[27] *See, e.g.,* Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

considerable market value.

115.    An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[28]

116.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[29,30]

117.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[31]

118.    Conversely sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[32]

119.    As a result of the Data Breach, Plaintiffs' and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

120.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information

---

[28] https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[29] https://datacoup.com/
[30] https://digi.me/what-is-digime/
[31]    Nielsen Computer & Mobile Panel, *Frequently Asked Questions, available at* https://computermobilepanel.nielsen.com/ui/US/en/faqen.html
[32]    *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Sep. 13, 2022).

compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, e.g., names and Social Security numbers.

121.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

122.    The fraudulent activity resulting from the Data Breach may not come to light for years.

123.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

124.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to thousands of individuals' detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

125.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

O.    *Future Cost of Credit & Identity Theft Monitoring is Reasonable and Necessary*

126.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, the volume of data obtained in the Data Breach, and each of Plaintiffs' PII already being disseminated on the dark web (as discussed below), there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black

market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –*e.g.,* opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

127.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

128.    Consequently, Plaintiffs and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

129.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

### P.    *Loss Of The Benefit Of The Bargain*

130.    Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to pay Defendant and/or its agents for products and/or services, Plaintiffs and other reasonable consumers understood and expected that they were, in part, paying for the product and/or service and necessary data security to protect the PII, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received products and/or services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

Q.    *Plaintiffs Experiences*

### Plaintiff Lacheryl Oneal

131.    Plaintiff Lacheryl Oneal is a current Lumico customer who opened a Lumico account in or about 2020.

132.    In order to open a Lumico account, she was required to provide her PII to Defendant, including her name, gender, address, date of birth, and Social Security number.

133.    At the time of the Data Breach—approximately May 29, 2023, through May 30, 2023—Defendant retained Plaintiffs' PII in its system.

134.    Plaintiff Oneal is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. she has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendant had she known of Defendant's lax data security policies.

135.    Plaintiff Lacheryl Oneal received the Notice Letter, by U.S. mail, directly from Defendant, dated July 24, 2023. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties, including her name, contact information, gender, date of birth, Social Security number, address, and policy number.

136.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter, replacing debit cards, and contacting financial institutions. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

137.    Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) lost or diminished value of her PII; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

138.    As a result of the Data Breach, Plaintiff further suffered actual injury in the form of her PII being disseminated on the dark web, which, upon information and belief, was caused by the Data breach.

139.    Moreover, Plaintiff suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

140.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

141.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

142.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

143.    Plaintiff Lacheryl Oneal has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and

safeguarded from future breaches.

**Plaintiff Latonya Williams**

144.    Plaintiff Latonya Williams is a former Lumico customer who opened a Lumico account in or about 2021.

145.    In order to open a Lumico account, she was required to provide her PII to Defendant, including her name, gender, address, date of birth, and Social Security number.

146.    At the time of the Data Breach—approximately May 29, 2023, through May 30, 2023—Defendant retained Plaintiffs' PII in its system.

147.    Plaintiff Williams is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. she has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendant had she known of Defendant's lax data security policies.

148.    Plaintiff Latonya Williams received the Notice Letter, by U.S. mail, directly from Defendant, dated July 24, 2023. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties, including her name, contact information, gender, date of birth, Social Security number, address, and policy number.

149.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter and contacting financial institutions to sort out fraudulent activity. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost

forever and cannot be recaptured.

150. Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) lost or diminished value of her PII; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

151. As a result of the Data Breach, Plaintiff also suffered actual injury in the form of three fraudulent charges for approximately $160 each placed under her name in or about June 2023 through August 2023.

152. Plaintiff further suffered actual injury in the form of her PII being disseminated on the dark web, according to JP Morgan Chase Bank, which, upon information and belief, was caused by the Data breach.

153. Moreover, Plaintiff suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

154. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

155. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

156.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

157.    Plaintiff Latonya Williams has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**Plaintiff Fannie Colay**

158.    Plaintiff Fannie Colay is a former Lumico customer who closed her account in or about 2022.

159.    In order to open a Lumico account, she was required to provide her PII to Defendant, including her name, gender, address, date of birth, and Social Security number.

160.    At the time of the Data Breach—approximately May 29, 2023, through May 30, 2023—Defendant retained Plaintiff's PII in its system despite the fact that Plaintiff had closed her Lumico account.

161.    Plaintiff Colay is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. she has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendant had she known of Defendant's lax data security policies.

162.    Plaintiff Fannie Colay received the Notice Letter, by U.S. mail, directly from Defendant, dated July 24, 2023. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties, including her name, contact information, gender, date of birth, Social Security number, address, and policy number.

163.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not

limited to: contacting financial institutions to close fraudulent accounts opened in her name, contacting credit bureaus to secure her accounts, changing passwords and resecuring her own computer networks, and contacting merchants about potentially fraudulent charges. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

164.    Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) lost or diminished value of her PII; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

165.    As a result of the Data Breach, Plaintiff also suffered actual injury in the form of a financial account being open falsely under her name.

166.    Plaintiff further suffered actual injury in the form of her PII being disseminated on the dark web, which, upon information and belief, was caused by the Data breach.

167.    Moreover, Plaintiff suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

168.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about

the Data Breach's occurrence.

169.     As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

170.     As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

171.     Plaintiff Fannie Colay has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## V.   CLASS ACTION ALLEGATIONS

172.     Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

173.     Specifically, Plaintiffs propose the following Nationwide Class, subject to amendment as appropriate:

**Nationwide Class**

All individuals in the United States whose PII was impacted as a result of the Data Breach (the "Class").

174.     In addition, Plaintiffs Oneal and Williams propose the following Illinois Subclass, subject to amendment as appropriate:

**Illinois Subclass**

All individuals in Illinois whose PII was impacted as a result of the Data Breach (the "Illinois Subclass").

175.     Excluded from the Classes are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom

this case is assigned as well as their judicial staff and immediate family members.

176.    Plaintiffs reserve the right to modify or amend the definition of the proposed Nationwide Class and/or Illinois Subclass, as well as add subclasses, before the Court determines whether certification is appropriate.

177.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

178.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiffs believe that the proposed Class includes thousands of individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class Members is unknown to Plaintiffs but may be ascertained from Defendant's records.

179.    <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

      a.    Whether Lumico engaged in the conduct alleged herein;

      b.    Whether Lumico's conduct violated the FTCA and/or GBLA;

      c.    When Lumico learned of the Data Breach;

      d.    Whether Lumico's response to the Data Breach was adequate;

      e.    Whether Lumico unlawfully lost or disclosed Plaintiffs' and Class Members' PII;

      f.    Whether Lumico failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

      g.    Whether Lumico's data security systems prior to and during the Data Breach

complied with applicable data security laws and regulations;

h.   Whether Lumico's data security systems prior to and during the Data Breach were consistent with industry standards;

i.   Whether Lumico owed a duty to Class Members to safeguard their PII;

j.   Whether Lumico breached its duty to Class Members to safeguard their PII;

k.   Whether hackers obtained Class Members' PII via the Data Breach;

l.   Whether Lumico had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and the Class Members;

m.   Whether Lumico breached its duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

n.   Whether Lumico knew or should have known that its data security systems and monitoring processes were deficient;

o.   What damages Plaintiffs and Class Members suffered as a result of Lumico's misconduct;

p.   Whether Lumico's conduct was negligent;

q.   Whether Lumico was unjustly enriched;

r.   Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages;

s.   Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

t.   Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

180.    <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class Member, were compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class Members because, inter alia, all Class Members were injured through the common misconduct of Lumico. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of Class Members arise from the same operative facts and are based on the same legal theories.

181.    <u>Adequacy of Representation.</u> Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel are competent and experienced in litigating class actions, including data privacy litigation of this kind.

182.    <u>Predominance</u>. Lumico has engaged in a common course of conduct toward Plaintiffs and Class Members in that all of Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Lumico's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

183.    <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to

40

individual Class Members, which would establish incompatible standards of conduct for Lumico. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

184.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Lumico has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

185.     Finally, all members of the proposed Class are readily ascertainable. Lumico has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent Notice of the Data Security Incident by Lumico.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### Negligence
### (On Behalf of Plaintiffs and the Class)

186.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 184.

187.     Defendant requires its customers, including Plaintiffs and Class Members, to submit non-public PII in the ordinary course of providing its insurance services.

188.     Defendant gathered and stored the PII of Plaintiffs and Class Members as part of its business of soliciting its services to its customers, which solicitations and services affect commerce.

189.     Plaintiffs and Class Members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

190.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII were wrongfully disclosed.

191.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to exercise due diligence in selecting IT vendors and to audit, monitor, and ensure the integrity of its vendor's systems and practices and to give prompt notice to those affected in the case of a data breach.

192.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

193.    Defendant's duty to use reasonable security measures also arose under the GLBA, under which they were required to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

194.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

195.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Lumico and Plaintiffs and Class Members. That special relationship arose because Plaintiffs and the Class entrusted Lumico with their

confidential PII, a necessary part of being customers of Defendant.

196.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

197.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Class.

198.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII it was no longer required to retain pursuant to regulations.

199.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach.

200.    Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiffs and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

201.    Defendant breached its duties, pursuant to the FTC Act, GLBA, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

   a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

   b.  Failing to adequately monitor the security of their networks and systems;

   c.  Failing to audit, monitor, or ensure the integrity of its vendor's data security

practices;

d.  Allowing unauthorized access to Class Members' PII;

e.  Failing to detect in a timely manner that Class Members' PII had been compromised;

f.  Failing to remove former customers' PII it was no longer required to retain pursuant to regulations,

g.  Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

h.  Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

202.    Defendant violated Section 5 of the FTC Act and GLBA by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

203.    Plaintiffs and Class Members were within the class of persons the Federal Trade Commission Act and GLBA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statues were intended to guard against.

204.    Defendant's violation of Section 5 of the FTC Act and GLBA constitutes negligence.

205.    The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive

practices, caused the same harm as that suffered by Plaintiffs and the Class.

206.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

207.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the insurance industry.

208.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if the PII were wrongfully disclosed.

209.    Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems.

210.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

211.    Plaintiffs and the Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

212.    Defendant was in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

213.    Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the

actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

214.    Defendant has admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

215.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Class, the PII of Plaintiffs and the Class would not have been compromised.

216.    There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The PII of Plaintiffs and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

217.    As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) each Plaintiffs' PII being disseminated on the dark web; (ii) Plaintiff Williams experiencing three fraudulent charges to her financial account in June 2023 through August 2023; (iii) Plaintiff Colay experiencing identity theft in the form of a fraudulent bank account opened false under her name; (iv) an increase in spam calls, texts, and/or emails; (v) invasion of privacy; (vi) lost or diminished value of PII; (vii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (viii) loss of benefit of the bargain; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for

unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

218.    As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

219.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

220.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

221.    Defendant's negligent conduct is ongoing, in that it still holds the PII of Plaintiffs and Class Members in an unsafe and insecure manner.

222.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

### COUNT II
### Breach Of Implied Contract
### (On Behalf of Plaintiffs and the Class)

223.    Plaintiffs re-allege and incorporate by reference herein all of the allegations

contained in paragraphs 1 through 184.

224.    Plaintiffs and Class Members were required to provide their PII to Defendant as a condition of receiving insurance and/or other services from Defendant.

225.    Plaintiffs and the Class entrusted their PII to Defendant. In so doing, Plaintiffs and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

226.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

227.    Implicit in the agreement between Plaintiffs and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

228.    The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

229.    Defendant solicited, offered, and invited Plaintiffs and Class Members to provide their PII as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their PII to Defendant.

230.    In accepting the PII of Plaintiffs and Class Members, Defendant understood and agreed that it was required to reasonably safeguard the PII from unauthorized access or disclosure.

231.    On information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiffs and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

232.    On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' PII would remain protected.

233.    Plaintiffs and Class Members paid money and provided their PII to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

234.    Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

235.    Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

236.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

237.    Defendant breached the implied contracts it made with Plaintiffs and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiffs and the Class once the relationship ended, and by failing to provide accurate notice

to them that personal information was compromised as a result of the Data Breach.

238.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiffs and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

239.    Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

240.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT III**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

241.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 184.

242.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they paid for services from Defendant and/or its agents and in so doing also provided Defendant with their PII. In exchange, Plaintiffs and Class Members should have received from Defendant the services that were the subject of the transaction and should have had their PII protected with adequate data security.

243.    Defendant knew that Plaintiffs and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendant profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' PII for business purposes.

244.    Defendant failed to secure Plaintiffs' and Class Members' PII and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their PII provided.

245.    Defendant acquired the PII through inequitable record retention as it failed to disclose the inadequate data security practices previously alleged.

246.    If Plaintiffs and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would have entrusted their PII at Defendant or obtained services at Defendant.

247.    Plaintiffs and Class Members have no adequate remedy at law.

248.    Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

249.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) each Plaintiffs' PII being disseminated on the dark web; (ii) Plaintiff Williams experiencing three fraudulent charges to her financial account in June 2023 through August 2023; (iii) Plaintiff Colay experiencing identity theft in the form of a fraudulent bank account opened false under her name; (iv) an increase in spam calls, texts, and/or emails; (v) invasion of privacy; (vi) lost or diminished value of PII; (vii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (viii) loss of benefit of the bargain; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

250.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

251.    Plaintiffs and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT IV**
**Violation of New York General Business Law § 349**
**(On Behalf of Plaintiffs and the Class)**

252.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 184.

253.    Defendant, while operating in New York, engaged in deceptive acts and practices in the conduct of business, trade, and commerce and the furnishing of services, in violation of N.Y. Gen. Bus. Law § 349(a). This includes but is not limited to the following:

a.    Defendant failed to enact adequate privacy and security measures to protect the Class Members' PII from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach;

b.    Defendant failed to take proper action following known security risks and prior cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.    Defendant knowingly and deceptively misrepresented that it would maintain adequate data privacy and security practices and procedures to safeguard the PII

52

from unauthorized disclosure, release, data breaches, and theft;

d.  Defendant knowingly and deceptively misrepresented that it would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of PII; and

e.  Defendant failed to disclose the Data Breach to the victims in a timely and accurate manner, in violation of the duties imposed by, inter alia, N.Y. Gen Bus. Law § 899-aa(2).

254.  As a direct and proximate result of Defendant's practices, Plaintiffs and other Class Members suffered injury and/or damages, including, but not limited to, time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft, and loss of value of their PII.

255.  The above unfair and deceptive acts and practices by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and the Class Members that they could not reasonably avoid, which outweighed any benefits to consumers or to competition.

256.  Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard PII entrusted to it, and that risk of a data breach or theft was highly likely. Defendant's actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing, and willful.

257.  Plaintiffs seek relief under N.Y. Gen. Bus. Law § 349(h) for actual damages (to be proven at trial), injunctive relief, and/or attorney's fees and costs. Plaintiffs does not seek statutory damages.

258.  Plaintiffs and Class Members seek to enjoin the unlawful deceptive acts and

practices described above. Each Class Member will be irreparably harmed unless the Court enjoins Defendant's unlawful, deceptive actions, because, as detailed herein, Defendant will continue to fail to protect PII entrusted to it.

259.    Plaintiffs and Class Members seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief prohibiting Defendant from continuing to disseminate its false and misleading statements, and other relief allowable under N.Y. Gen. Bus. Law § 349.

**<u>COUNT V</u>**
**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA"),**
**815 Ill. Comp. Stat. §§ 505/1, *et seq.***
**(On Behalf of Plaintiffs Oneal, Williams, and the Illinois Subclass)**

260.    Plaintiffs Oneal and Williams ("Plaintiffs" for the purposes of this count) re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 184.

261.    Plaintiff and the Illinois Subclass are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e).

262.    Plaintiffs, the Illinois Subclass, and Defendant are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c).

263.    Defendant is engaged in "trade" or "commerce," including the provision of services, as defined under 815 Ill. Comp. Stat. § 505/1(f). Defendant engages in the sale of "merchandise" (including services) as defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

264.    Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment and omission of material facts in connection with the sale and advertisement of their services in violation of the CFA, including: (1) failing to maintain adequate data security to keep Plaintiffs' and the Illinois Subclass's sensitive from being stolen by cybercriminals and

failing to comply with applicable state and federal laws and industry standards pertaining to data security, including the FTC Act and GLBA; (2) failing to disclose or omitting materials facts to Plaintiffs and the Illinois Subclass regarding their lack of adequate data security and inability or unwillingness to properly secure and protect the PII of Plaintiffs and the Illinois Subclass; (3) failing to disclose or omitting materials facts to Plaintiffs and the Illinois Subclass about Defendant's failure to comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the of Plaintiffs and the Illinois Subclass; and (4) failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Plaintiffs and the Illinois Subclass's PII and other personal information from further unauthorized disclosure, release, data breaches, and theft.

265.    These actions also constitute deceptive and unfair acts or practices because Defendant knew the facts about their inadequate data security and failure to comply with applicable state and federal laws and industry standards would be unknown to and not easily discoverable by Plaintiffs and the Illinois Subclass and defeat their reasonable expectations about the security of their PII.

266.    Defendant intended that Plaintiffs and the Illinois Subclass rely on its deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendant's offering of goods and services.

267.    Defendant's wrongful practices were and are injurious to the public because those practices were part of Defendant's generalized course of conduct that applied to the Illinois Subclass. Plaintiffs and the Illinois Subclass have been adversely affected by Defendant's conduct and the public was and is at risk as a result thereof.

268.    Defendant also violated 815 ILCS 505/2 by failing to promptly and adequately

notify Plaintiffs and the Illinois Subclass of the nature and extent of the Data Breach pursuant to the Illinois Personal Information Protection Act, 815 ILCS 530/1, *et seq*. As a result of Defendant's wrongful conduct, Plaintiffs and the Illinois Subclass were injured in that they never would have provided their PII to Defendant, or purchased Defendant's services, had they known or been told that Defendant failed to maintain sufficient security to keep their PII from being hacked and taken and misused by others.

269.    As a direct and proximate result of Defendant's violations of the CFA, Plaintiffs and the Illinois Subclass have suffered harm, including actual instances of identity theft; loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; financial losses related to the payments or services made to Defendant or Defendant's customers that Plaintiffs and the Illinois Subclass would not have made had they known of Defendant's inadequate data security; lost control over the value of their PII; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII, entitling them to damages in an amount to be proven at trial.

270.    Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiffs and the Illinois Subclass seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees as a result of Defendant's violations of the CFA.

### COUNT VI
**Violations Of Illinois' Personal Information Protection Act ("PIPA")**
**815 ILCS 530/10(a)**
**(On Behalf of Plaintiffs Oneal, Williams, and the Illinois Subclass)**

271.    Plaintiffs Oneal and Williams ("Plaintiffs" for the purposes of this count) re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 184.

272.    Section 10(b) of PIPA states, in pertinent part,

Any data collector that maintains or stores, but does not own or license, computerized data that includes personal information that the data collector does not own or license shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person.

815 ILCS 530/10(b).

273.    Defendant is a "data collector" as defined by the statute; it is an insurance company that "handles, collects, disseminates, or otherwise deals with nonpublic personal information. 815 ILCS 530/5.

274.    Plaintiffs' claims are based on their status as an "owner" of their personal information.

275.    Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach.

276.    Section 45 of Illinois's Personal Information Protection Act requires entities who maintain or store "personal information concerning an Illinois resident" to "implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure."

277.    Defendant's conduct violated the Personal Information Protection Act.

278.    Specifically, Defendant voluntarily undertook the act of maintaining and storing Plaintiffs' and Class Members' PII, but Defendant failed to implement safety and security procedures and practices sufficient to protect from the data breach that it should have anticipated. Defendant should have known and anticipated that data breaches were on the rise and that insurance companies were lucrative or likely targets of cybercriminals looking to steal PII. Correspondingly, Defendant should have implemented and maintained procedures and practices appropriate to the nature and scope of information compromised in the data breach.

279.    As a result of Defendant's violation of the Personal Information Protection Act, Plaintiffs and the Class Members incurred economic damages, including expenses associated with necessary credit monitoring.

**PRAYER FOR RELIEF**

WHEREFORE**,** Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

A.    For an Order certifying this action as a class action and appointing Plaintiffs and their counsel to represent the Class, pursuant to Federal Rule of Civil Procedure 23;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.    requiring Defendant to delete, destroy, and purge the personal
        identifying information of Plaintiffs and Class Members unless
        Defendant can provide to the Court reasonable justification for the
        retention and use of such information when weighed against the privacy
        interests of Plaintiffs and Class Members;

iv.     requiring Defendant to implement and maintain a comprehensive
        Information Security Program designed to protect the confidentiality
        and integrity of the PII of Plaintiffs and Class Members;

v.      prohibiting Defendant from maintaining the PII of Plaintiffs and Class
        Members on a cloud-based database;

vi.     requiring Defendant to engage independent third-party security
        auditors/penetration testers as well as internal security personnel to
        conduct testing, including simulated attacks, penetration tests, and
        audits on Defendant's systems on a periodic basis, and ordering
        Defendant to promptly correct any problems or issues detected by such
        third-party security auditors;

vii.    requiring Defendant to engage independent third-party security
        auditors and internal personnel to run automated security monitoring;

viii.   requiring Defendant to audit, test, and train their security personnel
        regarding any new or modified procedures; requiring Defendant to
        segment data by, among other things, creating firewalls and access
        controls so that if one area of Defendant's network is compromised,
        hackers cannot gain access to other portions of Defendant's systems;

59

ix.    requiring Defendant to conduct regular database scanning and securing checks;

x.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xi.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.   requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi.   for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.   For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

E.   For an award of punitive damages, as allowable by law;

F.   For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

G.   Pre- and post-judgment interest on any amounts awarded; and

H.   Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all triable issues.

DATED:  August 10, 2023          Respectfully submitted,

By: */s/ Vicki J. Maniatis*
Vicki J. Maniatis
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Tel.:    (865) 412-2700
vmaniatis@milberg.com

Gary M. Klinger
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN LLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (866) 252-0878
gklinger@milberg.com

Jeff Ostrow (*pro hac vice* forthcoming)
Kristen Lake Cardoso (*pro hac vice* forthcoming)
Steven Sukert (NY Bar 5690532)
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-525-4100
ostrow@kolawyers.com
cardoso@kolawyers.com
sukert@kolawyers.com

Andrew J. Shamis
**SHAMIS & GENTILE, P.A.**
14 NE 1st Avenue, Suite 400
Miami, FL 33132
Telephone: 305-479-2299
ashamis@shamisgentile.com

*Counsel for Plaintiffs and the Proposed Class*

*\*Pro Hac Vice* application forthcoming